## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| ETHEL COFFMAN and CHARLES COFFMAN,<br><br>Plaintiffs,<br><br>v.<br><br>VIRTUAL RADIOLOGIC CORPORATION, a Delaware corporation,<br><br>Defendant. | Case No: _____<br><br><br>**COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL<br>YES _X_   NO ___ |

## COMPLAINT

Plaintiffs, Ethel Coffman and Charles Coffman, by and through their attorneys, Ciresi Conlin, LLP and Leventhal & Puga, P.C., hereby submit the following Complaint and Jury Demand:

### I.  PARTIES AND JURISDICTION

1.     Plaintiff Ethel Coffman, hereafter referred to as "Plaintiff Mrs. Coffman," is a resident of and domiciled in the State of Indiana.

2.     Plaintiff Charles Coffman, hereafter referred to as "Plaintiff Mr. Coffman," is a resident of and domiciled in the State of Indiana.

3.     Defendant, Virtual Radiologic Corporation hereafter referred to as "Defendant VRad," was and is a Delaware corporation registered in Minnesota, with its headquarters and primary place of business located at 11995 Singletree Lane, Suite 500, Eden Prairie, Minnesota 55344.

4.      At all times relevant, Defendant VRad referred to itself as "vRad."

5.      This Honorable Court has jurisdiction as this is a diversity action filed under the provisions of 28 U.S.C. § 1332 by reason of the diversity of the citizenship of the parties and the amount in controversy.  The Plaintiffs are and were at all relevant times, residents of and domiciled in the State of Indiana.  Defendant VRad is a Delaware corporation, licensed to transact business in and with its primary place of business and headquarters in Minnesota, and is a citizen of the State of Minnesota for purposes of determining diversity jurisdiction. Venue is appropriate pursuant to 28 U.S.C. 1391(b)(2). The amount in controversy, without interest and costs, exceeds $75,000.00.

6.      This is a medical malpractice case that involves Dr. Alexander Serra, M.D.'s ("Dr. Serra") failure to appropriately review, interpret, report, and consult on CT imaging. As a direct and proximate result, Plaintiff Ethel Coffman suffered catastrophic and permanent injuries, damages, and losses, including but not limited to the below the knee amputation of both of her legs.

7.      At all material times herein, Dr. Serra was an employee, agent, and/or officer of Defendant VRad.

8.      Defendant VRad is vicariously and/or contractually liable for the actions and inactions of its employees, agents, or officers including Dr. Serra.

9.      At all relevant times, Defendant VRad had extensive business dealings with providing teleradiology physicians and services to healthcare facilities across the United States, including but not limited to Gunnison Valley Hospital ("GVH").

10.     At all relevant times, Dr. Serra was aware that he was receiving imaging studies from Defendant VRad that were taken in Colorado.

11.     At all relevant times, Dr. Serra was aware that his interpretations and/or reports of the imaging that he received from Defendant VRad were then sent back to Defendant VRad.

12.     At all relevant times, Dr. Serra was aware that after he sent his interpretations and/or reports back to Defendant VRad, Defendant VRad would then send this information back to the medical facility where the imaging was taken.

13.     At all relevant times, Dr. Serra was aware that after he sent his interpretations and/or reports to Defendant VRad they would be relied upon by healthcare providers in providing care and treatment to patients.

14.     At all relevant times, Dr. Serra was aware that on June 19, 2015, when he reviewed and interpreted Plaintiff Mrs. Coffman's imaging studies and sent those results to Defendant VRad, that Defendant VRad would send his interpretations and/or reports of her imaging to Plaintiff Ms. Coffman's healthcare providers and that they would rely upon his interpretations and/or report in providing care and treatment to Plaintiff Mrs. Coffman.

15.     For purposes of interpreting Plaintiff Mrs. Coffman's CT, GVH had contracted with a teleradiology company, Defendant VRad, to interpret and issue reports for the radiology performed at GVH, including Plaintiff Mrs. Coffman's CT. Defendant VRad is headquartered, has its principal place of business, and has a 24/7/365 Operations Center in Minnesota. Accordingly, the CT was sent electronically from GVH to Defendant VRad's facility in Minnesota. Defendant VRad processed the image and selected one of its

employee/agent radiologists, Dr. Serra, to interpret the CT. Defendant VRad sent Dr. Serra the imaging to his location in Washington. Upon information and belief, Dr. Serra interpreted the CT and dictated his impressions in Washington. Dr. Serra then sent his dictated impressions back to Defendant VRad in Minnesota. At that point, Defendant VRad used their "Custom Structured Report" to transcribe, organize, and compile Dr. Serra's dictated impressions. Defendant VRad's "Custom Structured Report" is "organized in a consistent template – regardless of radiologist reporting style – including Exam, Technique, Comparison, Findings and Impression identified and categorized according to organ system."

16.     Plaintiffs allege that Dr. Serra negligently interpreted and reported on Plaintiff Mrs. Coffman's CT.

17.     By undertaking the reading, interpretation, and reporting of the CT, Dr. Serra had a physician-patient relationship with Plaintiff Mrs. Coffman. This relationship resulted in Dr. Serra having the duty to reasonably interpret and report on the CT pursuant to a nationwide standard of care.

18.     By all assessable factors, Defendant VRad retained and exercised control over every aspect of Dr. Serra's work for Defendant VRad, from start to finish. Defendant VRad provided the imaging; the imaging could only be interpreted by using the software, hardware, reading platform, and support staff that Defendant VRad supplied; Defendant VRad controlled the order in which the imaging could be interpreted; Defendant VRad required Dr. Serra to follow its policies, procedures, and quality assurance programs; and Defendant VRad compiled Dr. Serra's dictated impressions into its proprietary report-

4

complete with Defendant VRad's name and logo. All of the processes, policies, procedures, software, and hardware were proprietary to VRad. Additionally, Defendant VRad was responsible for providing information about Dr. Serra to GVH to obtain credentials and privileges for Dr. Serra to read and interpret imaging studies of patients such as Plaintiff Mrs. Coffman at GVH. Simply put, Defendant VRad controlled every step of the process by which Dr. Serra interpreted Plaintiff Mrs. Coffman's CT and Dr. Serra was incapable of interpreting that CT without Defendant VRad's control, support, and proprietary equipment, software, workflow and platform. Finally, according to Defendant VRad's own website: "vRad is the leading radiology practice in the United States for a reason. It's a great place to work. Our desirable case mix, teleradiology's most sophisticated software platform in your home office, and a dedicated administrative support team — which many of our radiologists refer to as their "virtual personal assistants"—are a few of the reasons cited on our physician employee satisfaction surveys."

19.    At all relevant times, Dr. Serra consented to act on behalf of Defendant VRad and was subject to their control over the manner in which he performed his work for them.

20.    At all relevant times, Dr. Serra was acting as an employee, agent, or ostensible agent of Defendant VRad acting within the course and scope of that employment, agency, or ostensible agency.

21.    Defendant VRad's most significant relationship is with Minnesota. Defendant VRad is headquartered in Minnesota, its principal place of business is in Minnesota, it received and sent imaging and imaging reports from its Operations Center in

Minnesota, and it conducted all of its business related to Dr. Serra and GVH from Minnesota. Minnesota law should apply to Defendant VRad.

22.     Defendant VRad is a Minnesota based company that provides national teleradiology services and telemedicine with over 500 of their physicians, in over 2,100 hospitals, and in all 50 states.

23.     Pursuant to Minnesota law, Defendant VRad is vicariously liable for the acts or omissions of its employees, agents, or ostensible agents, including physicians, acting within the course and scope of that employment, agency, or ostensible agency.

24.     On or about April 11, 2014, Gunnison Valley Hospital, hereafter referred to as "GVH", entered into a contract with VRad, whereby VRad assumed the teleradiology services at GVH from NightHawk Radiology Services, LLC ("NRS").

25.     The April 11, 2014 contract states "vRad accepts all obligations of NRS under this agreement. Any existing balance shall be payable to vRad. All references to NRS shall be deemed to refer to vRad."

26.     The April 11, 2014 contract lists Defendant VRad's "Address for Notice" as 11995 Singletree Lane Suite 500 Eden Prairie, Minnesota 55344.

27.     The April 11, 2014 contract is signed by Robert J. Santilli as the CEO of GVH.

28.     The April 11, 2014 contract is signed by Ben Strong, M.D. as the President of Virtual Radiologic Professionals of California, P.A.

29.     Dr. Strong is presently the Director of Specialty Imaging at Virtual Radiologic Corporation.

30.    The April 11, 2014 contract is signed by Jeffrey Harmsen as the CFO of Virtual Radiologic Corporation.

31.    At all times relevant, Defendant VRad was responsible for providing teleradiology services to GVH.

32.    At all relevant times, Defendant VRad was responsible for providing the names and information about its radiologists to GVH in order to obtain credentials and privileges to its radiologist at GVH

33.    On or about July 8, 2014, Defendant VRad provided GVH with a Physician Credentialing and Privileging Agreement that for the first time included Dr. Serra.

34.    On July 22, 2014, GVH signed the Agreement and stated its Medical Staff "relied upon the decisions of the Telemedicine Entity."

35.    At all relevant times, Defendant VRad was responsible for providing a Certificate of Liability Insurance to GVH for all of the radiologists it was providing to GVH to perform teleradiology duties.

36.    An insurance policy, titled "MASTER POLICY #5-10055" and dated April 7, 2016 provides insurance coverage for Defendant VRad and Dr. Serra for claims made related to GVH between May 1, 2016 through May 1, 2018.

37.    At all relevant times, Dr. Serra lists 11995 Singletree Lane, Suite 500, Eden Prairie, Minnesota 55344 as his "Practice Location."

38.    For the reasons stated above and incorporated herein, at all relevant times, Defendant Serra was an employee, agent, servant, and/or ostensible agent of Defendant VRad, and was, as such, acting within the course, scope, and authority of said agency

7

and/or employment and all of said acts were subsequently performed with the knowledge, acquiescence, ratification, and consent of the respective principals, and the benefits thereof accepted by said principals. At all relevant times, Defendant VRad was vicariously liable for and responsible for the acts and omissions of its agents and/or employees, including but not limited to Dr. Serra.

## II.    GENERAL ALLEGATIONS

39.    Plaintiffs incorporate Paragraphs 1 through 38 herein by reference.

### A. Dr. Serra Negligently Interpreted and Reported on Plaintiff Ethel Coffman's CT Imaging on June 19, 2015.

40.    At approximately 1550 hours on June 19, 2015, Plaintiff Mrs. Coffman (then 72 years old) was seen by Dr. Joseph Yeakel, M.D. ("Dr. Yeakel"), an emergency medicine physician at the Gunnison Valley Hospital Emergency Department. Plaintiff Mrs. Coffman presented to the emergency room with severe (10/10) abdominal and left flank pain, an elevated respiratory rate, hypertension, a history of urinary calculi (kidney stone), history of left staghorn calculus, difficulty with urination, and nausea. Plaintiff Mrs. Coffman's pain was so severe she was thrashing about in her bed. Dr. Yeakel ordered several medical tests to assist in diagnosing and treating Plaintiff Mrs. Coffman's medical condition. Plaintiffs allege that lab work for Plaintiff Mrs. Coffman and her presentation was consistent with an ongoing and/or impending infection.

41.    Plaintiff Mrs. Coffman underwent a CT scan of her abdomen and pelvis which was sent to Defendant VRad in Minnesota, who then sent it to Dr. Serra who reviewed the CT imaging in Washington State.

42.     Dr. Serra dictated his impressions of the CT imaging and then sent the dictation back to Defendant VRad in Minnesota.

43.     Defendant VRad, in Minnesota, transcribed the dictation into its proprietary report format and sent the report, with its name and logo on it, back to GVH.

44.     At approximately 1922 hours, Dr. Serra electronically signed the Preliminary Radiology Report of Plaintiff Mrs. Coffman's CT.

45.     Dr. Serra's Radiology Report of Plaintiff  Mrs. Coffman's Abdomen and Pelvis CT with Intravenous Contrast states: "5 mm calculus 2 cm above the ureteral vesicle junction is associated with mild left hydronephrosis and hydroureter as well as delayed nephrogram and excretion;" "Impression: 5mm calculus left ureter 2 cm above the ureterovesical junction is associated with moderate obstruction;" and Stomach and bowel: Cecum is 7 cm in diameter and fluid-filled most likely reflecting a dynamic ileus."

46.     Objective signs and symptoms of and consistent with obstruction and infection and/or impending infection, including for Plaintiff Mrs. Coffman, constitute a medical emergency that requires immediate medical care and treatment, including but not limited to, hospital admission, fluids, antibiotics, consultations with appropriate specialists, urological intervention, and other immediate actions.

47.     Obstruction in the presence of infection and/or impending infection, including for Plaintiff Mrs. Coffman, is a medical emergency because it can reasonably be expected to develop into severe sepsis/septic shock.

48.     Risks and complications of sepsis/septic shock, including for Plaintiff Mrs. Coffman, include, but are not limited to: ischemia throughout the body, organ failure,

hypoxia, cardiomyopathy, cardiac complication, myocardial infarct, limb amputation/s, and death.

49.     Dr. Serra failed to take reasonable, necessary, and appropriate steps to ensure that he interpreted, reported, and/or consulted his findings of Plaintiff Mrs. Coffman's CT within the standard of care applicable to him as a physician licensed to practice medicine.

50.     Dr. Serra failed to reasonably, necessarily, and appropriately interpret, report, and/or consult regarding Plaintiff Mrs. Coffman's CT by, including but not limited to, failing to properly identify the size of the stone and the amount of obstruction it was causing and to report to and/or consult with Plaintiff Mrs. Coffman's medical care providers at GVH that a urology consultation was mandatory based on the CT imaging.

**B. Defendant VRad Had and Exercised Control Over Dr. Serra's Interpretation and Report of Plaintiff Ethel Coffman's CT and Authorized Him to Act on Its Behalf.**

51.     GVH contracted with Defendant VRad, a corporation headquartered in Minnesota, to provide "teleradiology services."

52.     Defendant VRad was responsible for receiving imaging studies from GVH, including but not limited to Plaintiff Mrs. Coffman's CT imaging.

53.     Defendant VRad was responsible for sending such imaging to one of its radiologists to be reviewed and interpreted.

54.     The radiologist would send their report, either in dictation or typed form, back to Defendant VRad.

55.     Defendant VRad was responsible for sending GVH the electronically signed radiology report of the imaging.

56.     Defendant VRad was responsible for the hiring, credentialing, supervision, and retention of its radiologists, including but not limited to Dr. Serra.

57.     Upon information and belief, Defendant VRad sent GVH the "Preliminary Radiology Report" via a Fax Server at approximately 2023 hours Central Standard Time or 1923 hours Mountain Standard Time.

58.     In the alternative, upon information and belief, Defendant VRad sent GVH the Preliminary Radiology Report via a Fax Server at approximately 2023 hours Mountain Standard Time.

59.     Dr. Serra was only able to receive, interpret, and issue a report on Plaintiff Mrs. Coffman's CT imaging by virtue of his employment and/or agency relationship with Defendant VRad.

60.     At all times relevant, Defendant VRad provided a proprietary reading platform and the support of its 24/7 Operations Center Team in Minnesota, to maximize Dr. Serra's clinical focus or "eyes on images" and minimize administrative distractions.

61.     At all times relevant, Defendant VRad's patented, rules-based platform automatically routed tens of thousands of patient studies every day to its employee/agent radiologists based on physician licensing and credentialing status, worklist depth, subspecialty expertise, facility preference, study type, and other factors.

62.     At all times relevant, Dr. Serra was an employee and/or agent of Defendant VRad.

63.     At all relevant times, Dr. Serra was acting within the course and scope of his employment by and/or within his actual and/or apparent authority as agent of Defendant VRad.

64.     At all relevant times, Defendant VRad was responsible for ensuring Dr. Serra had radiology privileges and credentialing at GVH.

65.     Upon information and belief, at all times relevant, Defendant VRad had an employment contract with Dr. Serra.

66.     Upon information and belief, at all times relevant, Dr. Serra received payment from Defendant VRad for performing radiology services for them.

67.     At all times relevant, Dr. Serra agreed to act for Defendant VRad by performing radiology services.

68.     At all times relevant, Defendant VRad authorized Dr. Serra to act on its behalf.

69.     At all times relevant, Defendant VRad controlled the means and manner by which Dr. Serra performed his radiology services and duties, including but not limited:

    a.  Defendant VRad provided the imaging studies for Dr. Serra to perform his radiology duties;

    b.  Defendant VRad provided equipment for Dr. Serra that enabled him to perform his radiology duties and without such equipment he could not have interpreted imaging sent to him by Defendant VRad;

c. Defendant VRad provided proprietary software to Dr. Serra that enabled him to perform his radiology duties and without such software he could not have interpreted imaging sent to him by Defendant VRad;

d. Defendant VRad controlled the order in which Dr. Serra could read imaging studies;

e. Dr. Serra was required to follow Defendant VRad's policies and procedures when performing his radiology duties;

f. Defendant VRad required Dr. Serra to follow its patented 360° Optimized Radiology Workflow when performing his radiology duties;

g. Defendant VRad provided education and training to Dr. Serra so that he could perform his radiological duties when reading imaging he received from Defendant VRad;

h. Defendant VRad provided support staff to Dr. Serra so that he could perform his radiology duties when reading imaging he received from Defendant VRad;

i. Defendant VRad monitored Dr. Serra's performance;

j. Defendant VRad provided peer review, standardized monitoring of quality metrics, and active clinical oversight and management in attempt to ensure it was delivering quality patient care.

k. Defendant VRad reserved the "STAT" designation for cases for which an extremely rapid interpretation is critical and the turnaround time for STAT cases is typically 20 minutes or less;

l.   Dr. Serra relied on Defendant VRad's designation and prioritization of the cases it sent to him;

m.   Defendant VRad provided Dr. Serra a Credentialing, Licensing and Privileging (CLP) support person who made sure all required credentialing, licensing and privileging processes are maintained to The Joint Commission standards.

n.   Defendant VRad's credentialing process for GVH for Dr. Serra included: Education, Medical Malpractice Coverage, State Licensure, entire Work History, Board Certification, References, Hospital Affiliations and NPDB, FSMB, FACIS, OIG, GSA and Background Checks.

o.   Defendant VRad maintains a "24/7/365 Operations Center (OC)" where personnel monitor every incoming order from across the country — from the moment it receives the order, until its automated system forwards the report to the ordering physician or client facility. Each step is recorded, time stamped, and supervised and its patented, rules-based, auto-routing feature seeks to ensure the right study gets to the right radiologist — in the shortest amount of time.

70.   Upon information and belief, at all times relevant, Dr. Serra consented to Defendant VRad's control over the means and manner by which he performed his radiology services.

71.   Defendant VRad's "24/7/365 Operations Center" is located in Minnesota.

72.     Plaintiff Mrs. Coffman's CT imaging was sent by GVH to Defendant VRad in Minnesota.

73.      Plaintiff Mrs. Coffman's CT imaging was then sent by Defendant VRad in Minnesota to Dr. Serra in Washington State.

74.     Dr. Serra, in Washington, interpreted and dictated his impressions of Plaintiff Mrs. Coffman's CT imaging.

75.     Dr. Serra then sent his dictated impressions of Plaintiff Mrs. Coffman's CT imaging back to Defendant VRad in Minnesota.

76.     Defendant VRad then used its proprietary system to transcribe Dr. Serra's dictation and issued a report to GVH using its proprietary "Custom Structured Report."

77.     The CT Report sent back by Defendant VRad to GVH contains Defendant VRad's name and logo.

78.     At approximately 1922 hours, it was documented the CT read was pending.

79.     At approximately 1924 hours, Plaintiff Coffman reported that she was feeling nausea, had been making frequent trips to the restroom, and that she was having diarrhea.

80.     At approximately 1937 hours, Dr. Yeakel ordered Percocet PO 5/325 mg (6 pack to go).

81.     At approximately 1937 hours, Dr. Yeakel ordered Flomax PO 0.4 mg (NOW x1).

82.     At approximately 1938 hours, Dr. Yeakel ordered a Urine Strainer (disp with instructions).

83.     At approximately 1940 hours, Dr. Yeakel was at Plaintiff Mrs. Coffman's bedside.

84.     At approximately 1940 hours, Dr. Yeakel ordered Zofran ODT PO 4 mg (NOW x1).

85.     At approximately 1946 hours, Nurse Brockschmidt administered Zofran ODT (PO) 4 mg to Plaintiff Mrs. Coffman.

86.     At approximately 1947 hours, it was documented that "HL pulled out from x-ray."

87.     At approximately 2017 hours, Plaintiff Mrs. Coffman was administered Flomax PO .4 mg.

88.     Dr. Yeakel documented: Abdominal CT: "A urinary calculus is present in the left distal ureter (5 mm)."

89.     Dr. Yeakel's clinical impressions were: renal colic, ureterolithiasis, and that the clinical picture did not suggest cholecystitis or appendicitis.

90.     At approximately 2020 hours, Plaintiff Mrs. Coffman was discharged from GVH to her husband, without any care or treatment to address her emergency medical condition.

91.     Plaintiff Mrs. Coffman's condition continued to deteriorate in the emergency room resulting in Plaintiff Mrs. Coffman suffering from multiple bouts of diarrhea and return of nausea despite anti-nausea medications.  Plaintiff Mrs. Coffman's clinical picture was consistent with a potentially life-threatening infection and emergency medical condition due to obstruction from the stone.

92.     Dr. Serra had a duty to provide reasonable medical care and treatment with regards to his interpretation, reading, consulting, reporting, and impressions of Plaintiff Mrs. Coffman's CT imaging.

93.     Dr. Serra's failure to satisfy his duties with regards to the CT imaging was a direct and proximate cause of Plaintiff Mrs. Coffman being discharged from GVH at 2020 hours on June 19, 2015 without proper care and treatment for her ongoing emergency medical condition resulting from her infection and/or impending infection and her obstructed ureter.

94.     Dr. Serra's failure to satisfy his duties with regards to the CT imaging was a direct and proximate cause of Plaintiff Mrs. Coffman's injuries damages and losses described more fully below.

95.     Defendant VRad is vicariously liable for any of Dr. Serra's acts or omissions.

## C.  On the morning of June 20, 2015, Plaintiff Ethel Coffman was Taken Back to GVH in Severe Sepsis and taken to St. Mary's Hospital Via Helicopter to Save Her Life.

96.     At approximately 730 hours on June 20, 2015, Plaintiff Mrs. Coffman awoke, got up from her bed, attempted to walk to the bathroom, and collapsed.

97.     Soon thereafter, her husband, Plaintiff Mr. Coffman, called 911.

98.     At approximately 820 hours, the ambulance arrived on the scene.

99.     The EMTs found Plaintiff Mrs. Coffman lying in bed in her own diarrhea.

100.    The EMTs did a physical exam of Plaintiff Mrs. Coffman and concluded: "POSSIBLE SEPTIC, DEHYDRATION."

101.    At approximately 952 hours, the ambulance arrived at the hospital.

102.    At approximately 952 hours, EMS transferred Plaintiff Mrs. Coffman's care to GVH.

103.    At approximately 957 hours, the patient was again admitted into the care of Nurse Brockschmidt and Dr. Yeakel.

104.    The admission note states:

    a.  Chief Complaint: abdominal pain and back pain, rash. This started today and is still present.

    b.  No chest pain or black stools.

    c.  She has had dizziness. (diarrhea, rash, lethargy per EMS).

    d.  Paramedics findings: altered mental status. No arrhythmia, no hypotensive or hypertensive.

    e.  Pre-hospital treatment: IV fluids given.

    f.  Recent medical care: the patient was seen recently in the ER department (yesterday: L UVJ stone. Left shift, normal WBC, urine clean).

    g.  Review of Systems Unobtainable Secondary to Condition.

    h.  Physical Exam: appearance: Lethargic. Patient in mild distress.

105.    At approximately 1020 hours, Plaintiff Mrs. Coffman's vital signs were documented as: HR 49, MAP 16 HR 17, ETCO2: 22

106.    At approximately 1020 hours, a urine sample was collected from Plaintiff Mrs. Coffman. The resulting microbiology report states: "Gram stain: many gram negative rods in aerobic and anaerobic bottles of second set of blood culture hand delivered to Dr. Yeakel at 2255 hours GVW 6/20/15. On 6/22/15 organisms identified: e-coli."

107.   The urinalysis from the 1020 sample states: clarity cloudy A, protein 100A, blood large A, U leukocytes small, Following are all abnormal: WBC 10-25A, RBC 25-50A, EPITH cells 2-5 A, bacteria: inconclusive, Amorph urate 4+, Casts: granular, mucous threads: present.

108.   At approximately 1022, a blood sample was collected from Plaintiff Mrs. Coffman, the results included:

  a.  WBC 14.8

  b.  BANDS: 37;

  c.  RBC 4.11;

  d.  Hemoglobin: 11.4;

  e.  Platelet Count: 77; and

  f.  Vacuoles: Initially not present, then found to be present.

109.   On June 23, 2015, a pathology review noted: agree with CBC, Neutrophilia with left shift, and Thrombocytopenia.

110.   At approximately 1023 hours, the records note: Started bag #1 1000ml IV fluid IV#2 bolus of 1000ml wide open via site #2.

111.   At approximately 1027 hours, the records note: Central line placed in rt. femoral vein.

112.   At approximately 1035 hours, the records note: Started 400 mg of Gentamicin IVPB in bag #1 250 ml over 30 mins via site #3 via IV pump.

113.   At approximately 1038 hours, the records note: Levophed Drip IV via site #3 Rate Changed: bag #1 increased to 10 mcg /min via IV pump.

114.    At approximately 1038 hours, the records note: Levophed Drip IV Co signature: dosage, concentration and rate verified (use 2 mg in 500 ml. waste 2mg).

115.    At approximately 1043 hours, the records note: Levophed Drip IV 10

116.    At approximately 1044 hours, Dr. Yeakel ordered: Gentamicin IVPB 400 NOW x1.

117.    At approximately 1047 hours, Plaintiff Mrs. Coffman's vitals were taken and recorded as:

      a.  BP: 67/43;

      b.  MAP: 51;

      c.  HR: 76; and

      d.  RR: 17

118.    At approximately 1057 hours, the records note: Patient remains responsive to questions but still disoriented. Will answer questions but states she does not understand what we are saying.

119.    At approximately 1115 hours, the records note: Gentamicin IVPB discontinued: bag #1 completed Total amount infused: 250ml.

120.    At approximately 1115 hours, the flight crew arrived.

121.    At approximately 1120 hours, notes: Levophed drip via IV #3, Rate Changed: bag #1 increased to 20 mcg/min.

122.    At approximately 1145, the records note: Intubation: Performed by flight crew. Placement confirmed by CXR. No complications.

123.    At approximately 1204 hours, Plaintiff Mrs. Coffman's vitals were taken and recorded as:

      a.   BP: 62/45;

      b.   MAP: 50; and

      c.   HR: 73.

124.    At approximately 1205 hours, the records note: Levophed discontinued bag #1. (change to vasopressin).

125.    At approximately 1220 hours, Plaintiff Mrs. Coffman was transferred to St. Mary's Hospital ("St. Mary's) via helicopter.

126.    At approximately 1258 hours, the medical record notes: Care Flight Critical Care transport rhythm strips. BP 93/54; HR 74;

127.    At approximately 1319 hours, the helicopter arrived at the St. Mary's emergency room.

128.    At approximately 1320 hours, Plaintiff Mrs. Coffman was admitted to the emergency room.

129.    At approximately 1341 hours, Dr. Padyk noted: Plaintiff Mrs. Coffman presents via rotary wing aircraft from Gunnison for evaluation of sepsis. Patient was seen yesterday in Gunnison and was founds to have a 5 mm left UVJ stone from CT abdomen with contrast. Her urine was clean, pain was managed adequately with small amounts of pain medication, and she was discharged home in good condition. Last night patient began to feel poorly. She represented to the ED hypotensive, lethargic and with a purple rash covering nearly half of her body. UA showed 10-20 WBC, lactate 7.3. In Gunnison, the

patient was aggressively resuscitated with crystalloid approximately 7 liters, norepinephrine and vasopressors, endotracheal intubation. She was treated with ceftriaxone and gentamicin IV. Patient presents to St. Mary's intubated, on vasopressors and Ketamine drip.

130.   At approximately 1341 hours, the medical record notes:

Lab results: WBC 17, lymphocyte percentage 4.0, neutrophil percentage 92.6, absolute lymphocytes 0.7, absolute neutrophils 15.7.

ED course: patient arrived to the ED intubated, treated with gentamicin and rocephin prior to arrival. Placed on vasopressin, and norepinephrine, and Ketamine drip in Gunnison or during transport. Prior to patient's arrival to the ED, I consulted with Dr. Kaleb Stepan ("Dr. Stepan"), urologist, who will be taking patient to OR for left ureteral stenting after her arrival to ED. I spoke to Dr. Gary Lambert, intensivist, who is aware of patient's condition. Patient will be taken to ICU after surgery.

Medical decision making: "this patient presents with findings consistent with septic shock. The patient has a known obstructing left UVJ stone thus making the source of her sepsis most likely infected urine and she is therefore transported rapidly to the OR for ureteral stenting. We don't see evidence of pneumonia. No finding of obvious intraabdominal source of infection based on abdominal pelvic CT obtained yesterday in Gunnison. CNS infection also likely based on the sum of date known at this time.  Critical care time: 20 minutes."

131.   At approximately 1415 hours, the records note: "The patient was directly transferred from the emergency room to the operating room. She was already intubated and sedated."

132.   According to Dr. Stepan's surgical note:

Pre-operative diagnoses: severe septic shock and left ureteral stone. Post-operative diagnoses: same.

Operation Performed: Cystoscopy; left retrograde pyelogram; left ureteral stent placement.

Indications: This is a 72-year-old female who was transferred to St. Mary's Hospital for severe septic shock. Presumptively, this was related to a left obstructing ureteral stone. She had no other potential source and her urine did look abnormal on today's examination. I recommended urgent decompression of her kidney. She was intubated and sedated.

Findings: she had purulent drainage on unobstructing the left collecting system. Some of this was sent for culture and sensitivity. A 26-cm 7-French stent was placed. The stent will remain in place and if she recovers from septic shock the stone will be definitively managed when she is medically stable. No complications. Left kidney urine for Gram's stain and C&S.

133.   At approximately 1415 hours, a urine sample was collected from Plaintiff Mrs. Coffman, which results later indicated:

Source: left ureter. Gram stain: few RBC's. Gram Stain: moderate WBC's. Gram stain: few gram negative, evaluation: rods. Culture results: moderate e-coli. Culture results: no anaerobes isolated.

134.    At approximately 1519 hours, Dr. Gary Lambert noted in his pulmonary care progress:

"Patient is a 72 year old female transferred from Gunnison Hospital presenting with worsening lethargy and feeling poorly 24 hours after being seen for ureteral stone. She was acidotic and hypotensive and transported to SMH ER. Urology consulted and she is s/p ureteral stent with report pyuria."

Consult: Infectious Disease: sepsis due to UTI and obstructing ureteral stone. Extensive ecchymosis/mottling suggests possible strep etiology. Renal: acute rental failure. Severe anion gap acidosis (23), hypokalemia. Disposition: critically ill; on vent support and pressors. Prognosis guarded.

135.    On or around June 23, 2015, Plaintiff Mrs. Coffman was extubated.

**D. As a Direct and Proximate Cause of Dr. Serra's Negligence on June 19, 2015, Plaintiff Ethel Coffman Had Both of Her Legs Amputated on July 8, 2015 and Defendant VRad is Vicariously Liable for All of Dr. Serra's Acts or Omissions.**

136.    On or around July 1, 2015, Plaintiff Mrs. Coffman consulted with plastic surgeon Dr. Stephen Cotlar.

137.    Dr. Cotlar's consult notes from that date state: "Physical examination showed black toes bilaterally, with dark skin extending on to the distal dorsal and plantar aspects of the feet. The areas of the heels were also quite dark. The dorsum and mid plantar aspects

of the fee had loose skin covering them. Beneath this, the skin was noted to be cool with a deep reddish appearance to it. On the anterior aspect of the left lower leg there was an area, approximately 15 x 3 cm, of loose skin with reddish appearing dermis beneath this which was cool to touch, although not quite as cool as the feet. There was also an area on the anterior aspect of the knee which was at least a deep tissue injury. On the dorsum of her right hand were areas of skin injury which appear to be more superficial, showing some evidence of healing. On left hand over the dorsum of the index finger there was some similar appearing skin, with the distal tip of the left index finger dark and mummified."

138.    Dr. Cotlar's impression concludes: "a 72-year-old lady with severe ischemic injury to bilateral feet and left lower leg secondary to vasopressors used in management of septic shock…Unfortunately, it appears as though she is going to require bilateral amputations"

139.    On July 8, 2015, Plaintiff Mrs. Coffman underwent bilateral below knee amputations (through tibia).

140.    The indication for the procedure notes by the surgeon, Dr. Steven R. Gammon: "The patient is a 72-year-old female who presented to St. Mary's Hospital from Gunnison hospital about a week and a half ago in septic shock. To save her life, she was given vasopressor medicines to encourage blood flow to her heart. Unfortunately, in doing this lifesaving measure she developed necrosis of both of her feet. The necrosis involves the entire plantar surface of both of her feet as well as islands of skin in her left anterior tibia and left anterior knee region. We have been waiting for  the skin edges to demarcate

to decide where to definitively do her amputation and we have decided upon doing bilateral below-the -knee amputation amputations in the mid tibia ."

141.    On July 28, 2015, Plaintiff Mrs. Coffman underwent an additional operation including: cystoscopy, left ureteroscopy, basket extraction of stone, left retrograde pyelogram, and left uretal stent removal.

142.    At that time, the stone was completely removed and Pathology determined its size to be 5 to 9 mm.

143.    As a direct and proximate result of the negligent and unlawful conduct of Dr. Serra, which Defendant VRad is vicariously liable for, Plaintiff Mrs. Coffman has suffered and will in the future suffer injuries, damages, and losses including but not limited to pain and suffering, emotional distress, mental anguish, humiliation, inconvenience, impairment of quality of life, loss of enjoyment of life, loss of essential and home services, permanent physical impairment, permanent amputations and loss of her body parts, significant and permanent organ injury and dysfunction, permanent disfigurement, out of pocket expenses, medical treatment, medical expenses, care expenses, medications, and other medical and life care costs.

144.    Below are images of Plaintiff Mrs. Coffman's ischemic and necrotic feet, face, and hand taken at St. Mary's Hospital, as well as a picture taken post amputations:







**FIRST CLAIM FOR RELIEF**

*(Vicarious Liability – Defendant VRad)*

145.    Plaintiffs incorporate Paragraphs 1 through 144 as if fully set forth herein.

146.    Defendant VRad is responsible for the acts and omissions of its agents, ostensible agents, employees, independent contractors, and/or servants, including but not limited to Dr. Serra, while acting under the supervision and control of Defendant VRad.

147.    At all relevant times, Dr. Serra was acting within the course and scope of his employment and/or within his actual or ostensible authority as agent of Defendant VRad.

148.    By law, the negligence of agents, employees, independent contractors, and/or servants of Defendant VRad is the negligence of Defendant VRad.

149.    At all relevant times, Dr. Serra owed a duty to Plaintiff Mrs. Coffman to exercise that degree of care, skill, caution, diligence, and foresight exercised by and expected of physicians in similar circumstances.

150.    At all relevant times, Dr. Serra breached that duty and was negligent in his care and treatment of Plaintiff Mrs. Coffman by, *inter alia*, the following:

       a.    Failing to timely and appropriately measure, interpret, evaluate, diagnose, and report his findings and impressions of Plaintiff Mrs. June 2015 abdominal and pelvic CT;

       b.    Failing to communicate and confer with Plaintiff Mrs. Coffman's treating healthcare providers;

       c.    Failing to consult with other healthcare providers;

       d.    Improperly reporting the findings of Plaintiff Mrs. Coffman's June 2015 abdominal and pelvic CT;

e. Failing to timely and appropriately appreciate and assess Plaintiff Mrs. Coffman's emergency condition;

f. Failing to appropriately evaluate and diagnose Plaintiff Mrs. Coffman in a timely manner;

g. Failing to timely and appropriately recommend further evaluation and follow up concerning Plaintiff Mrs. Coffman's June 2015 abdominal and pelvic CT;

h. Failing to timely and appropriately recommend consultation with appropriate medical providers concerning Plaintiff Mrs. Coffman's June 2015 abdominal and pelvic CT and her medical condition at that time;

i. Failing to correctly and completely measure, evaluate, diagnose, and report the correct and actual size of the kidney stone identified in Plaintiff Mrs. Coffman's June 2015 abdominal and pelvic CT;

j. Failing to correctly and completely measure, recognize, report, evaluate diagnose, and report the correct and actual amount of obstruction present in  Plaintiff Mrs. Coffman's June 2015 abdominal and pelvic CT;

k. Failing to inform or communicate Plaintiff Mrs. Coffman's true medical condition, appropriate differential diagnoses of her condition, and appropriate recommendations; and

l. Such other and further acts of negligence as may be revealed in discovery.

151. As a direct and proximate result of the negligent acts and omissions of Dr. Serra, Plaintiff Mrs. Coffman, has suffered and will in the future suffer injuries, damages, and losses as set forth more fully elsewhere herein.

152. As a direct and proximate result of the negligent acts and omissions of Defendant VRad, acting through their respective agents, employees, independent contractors, and/or servants, described elsewhere herein, Plaintiff Mrs. Coffman, has suffered and will in the future suffer injuries, damages, and losses as set forth more fully elsewhere herein.

## SECOND CLAIM FOR RELIEF
### (Loss of Consortium)

153. Plaintiffs incorporate Paragraphs 1 through 152 as if fully set forth herein.

154. At all relevant times, Plaintiffs Ethel Coffman and Charles Coffman, were married as husband and wife.

155. As a direct and proximate result of the negligent and unlawful conduct of Defendant VRad, acting through their respective agents, employees, independent contractors, and/or servants, described elsewhere herein, which directly and proximately caused Plaintiff Mrs. Coffman, to suffer injuries, damages, and losses more fully described elsewhere herein, Plaintiff Mr. Coffman, has suffered and will in the future suffer a loss of society, companionship, comfort, and consortium of his wife as those terms are defined at law.

WHEREFORE, Plaintiffs Ethel Coffman and Charles Coffman, pray for judgment against Defendant VRad and for compensatory damages in an amount to be determined by the trier of fact, pre-judgment interest, post-judgment interest, costs, attorneys' fees, and for such other and further relief as this Court may deem appropriate.

## PLAINTIFFS DEMAND A TRIAL BY JURY

Respectfully submitted this 15th day of June, 2017.

**CIRESI CONLIN LLP**

By: /s/ Barry M. Landy

Barry M. Landy, MN BAR #391307
225 South 6th Street, Suite 4600
Minneapolis, MN 55402
Telephone: (612) 361-8200
Facsimile: (612) 361-8242
bml@ciresiconlin.com

**LEVENTHAL & PUGA, P.C.**

By: _/s/ Hollynd Hoskins

Hollynd Hoskins, CO BAR #21890
Nicholas Temming, CO BAR #41127
Leventhal & Puga, P.C.
950 S. Cherry St., Ste. 600
Denver, CO 80246
Telephone: (303) 759-9945
ntemming@leventhal-law.com
hhoskins@leventhal-law.com

*Attorneys for Plaintiffs\**

*\*Pending Admission Pursuant to Pro Hac Vice Motion to Be Filed Upon Receipt of the Case Number in this Matter*

*A duly signed original is available for inspection at the offices of Leventhal & Puga, P.C.*

**Plaintiffs' Address:**
51584 Weymouth Court
South Bend, IN 46628